UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/3/2020____

------------------------------------------------------------------X
                            :

LARISA IVANOVNA MARKUS,          :
                            :

           Appellant,         :

                            :        19-cv-10781 (LJL)
        -v-                     :        19-cv-09611 (LJL)
                            :

YURI VLADIMIROVICH ROZHKOV,     :        <u>OPINION & ORDER</u>
                            :

           Appellee.        :
                            :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Victor A. Worms ("Worms"), as counsel for debtor Larisa Ivanovna Markus ("Markus")

in a Chapter 15 proceeding, appeals the Bankruptcy Court's orders imposing sanctions on him

and awarding fees to his opposing counsel. For the following reasons, the Bankruptcy Court's

sanctions and fees orders are affirmed in part and vacated in part. Both orders are remanded for

further proceedings.

## I.    FACTUAL BACKGROUND

      Larisa Ivanovna Markus is a Russian citizen. BK-ECF 2 at 2.[1] From 1995 through 2016,

she served as president of Vneshprombank, formerly one of Russia's largest banks. *Id.* at 3. In

2016, the Moscow Arbitration Court declared Vneshprombank insolvent and commenced a

bankruptcy proceeding. *In re Foreign Econ. Indus. Bank Ltd., "Vneshprombank" Ltd.*, 607 B.R.

---

[1] This opinion references various materials from the Bankruptcy Court's docket, which has case number 19-10096, and is abbreviated here as "BK-ECF." Immediately following "BK-ECF" is the docket number of the cited material, followed by number of the page where that material appears. Citations to "ECF" reference this Court's docket. Because there are two related appeals at issue, the opinion references two different ECF dockets, each bearing a different case number. The appeal of the Bankruptcy Court's sanctions order has case number 19-cv-9611, while the appeal of the Bankruptcy Court's fees order has case number 19-cv-10871. This opinion uses "Sanctions ECF" to reference the sanctions appeal (19-cv-9611) and "Fees ECF" to reference the fees appeal (19-cv-10871). As with the Bankruptcy Court citations, immediately following "Sanctions ECF" or "Fees ECF" is the docket number of the cited material, followed by number of the page where that material appears.

160, 163 (Bankr. S.D.N.Y. 2019).[2] In 2017, following a criminal conviction and appeal in Russian courts, Markus received an eight-and-a-half year prison sentence for large-scale fraud. BK-ECF 5-4, 5-5. According to the judgment of conviction, Markus "creat[ed] an organized criminal group from the Bank's employees and other persons," with the intent to "steal a significant amount of funds from the Bank." BK-ECF 5-4 at 29. Her role in the enterprise was, *inter alia*, "to find trusted persons and promote them to executive positions in the governing bodies of the Bank; . . .to plan the obtaining and further distribution of criminal proceeds, including outside of the Russian Federation; [and] to take action aimed at fostering the trust of the individuals who were the Bank's clients." *Id.* at 3–4.

Approximately one month after the Moscow Arbitration Court declared Vneshprombank insolvent, one of Markus's creditors applied for commencement of a personal bankruptcy proceeding against Markus. BK-ECF 6 at 2. That application was granted. *Id.* The Moscow Arbitration Court appointed Yuri Vladimirovich Rozhkov as Markus's financial administrator. *Id.* In May 2017, the Moscow Arbitration Court initiated a procedure to liquidate Markus's assets and appointed Yuri Vladimirovich Rozhkov to preside over the liquidation. *Id.* Under Russian Bankruptcy Law, Yuri Vladimirovich Rozhkov is responsible for pursuing actions against persons or entities that contributed to Markus' insolvency. *Id.*

On January 10, 2019, Yuri Vladimirovich Rozhkov, proceeding as Markus's Foreign Representative (hereinafter, "FR"), filed a Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceeding in the United States Bankruptcy Court for the Southern District of New York ("Chapter 15 Petition"). BK-ECF 2. The FR's declaration in support of the Chapter 15 Petition explained that he intended to "seek discovery concerning Ms. Markus' assets which

---

[2] On February 15, 2017, the United States Bankruptcy Court for the Southern District of New York granted the petition of Vneshprombank's trustee to recognize Vneshprombank's Russian bankruptcy proceeding as a foreign main proceeding. *See* Bankruptcy ECF Case No. 16-13534 at Dkt. No. 24.

might be located in the United States." BK-ECF 6 at 6. On April 1, 2019, the Bankruptcy Court

entered an order granting Chapter 15 recognition of the insolvency proceeding against Markus.

BK-ECF 29.

Discovery issues began almost immediately. *See* BK-ECF 45 at 65 (FR's counsel

referencing "a host of discovery disputes" at a hearing on April 11, 2019). In early May, counsel

for the FR (hereinafter, "the FR") asked the Bankruptcy Court to hold a conference regarding

discovery. BK-ECF 52. The Bankruptcy Court granted the request, setting a conference for May

29, 2019. *Id*. The day before the conference, Victor A. Worms filed an appearance on behalf of

Markus. BK-ECF 55. By letter dated May 28, 2019 (but docketed May 29, 2019), Worms

advised that he intended to file a motion to vacate the recognition order, and he requested a stay

of all proceedings pending a ruling on that motion. BK-ECF 56.[3]

The conference proceeded as scheduled on May 29, 2019. Soon after it began, Worms

orally requested "an interim stay of the discovery issues" in light of the "extraordinary nature" of

the proceedings. BK-ECF 59 at 13. The details of Worms's position on the recognition order are

not at issue in this appeal; in brief, he asserted that the Bankruptcy Court lacked jurisdiction at

the time it entered the recognition order and that Markus had suffered due process violations. *Id.*

at 11. The Bankruptcy Court declined to entertain those arguments at that time, noting, "[W]e are

now here for a discovery conference," but the Bankruptcy Court assured Worms that it would

take up those arguments if Worms brought "a proper motion." *Id.* at 12–13.

The Bankruptcy Court then heard argument on various discovery issues. Summarizing

the landscape, the Bankruptcy Court discerned "a little bit of exaggeration going on on both

sides"; while the FR was inaccurate to complain that he had received "nothing," there was

---

[3] Worms later informed the Bankruptcy Court that he completed and filed the letter at 12:02 a.m. on May 29, 2019. BK-ECF 59 at 10.

"clearly, clearly a pattern of not complying with . . . discovery obligations" on the part of certain Markus-related entities. *Id.* at 29. Ultimately, the Bankruptcy Court ordered counsel for certain entities to make a production that day. *Id.* at 32. Worms objected, arguing that he needed to see "any production relating to" Markus. *Id.* The Bankruptcy Court refused to delay the production, despite Worms's protestation that he "only got involved in the case yesterday." *Id.* On June 18, 2019, Worms filed a motion to vacate the recognition order. BK-ECF 70.

On June 24, 2019, the FR emailed Worms with a proposed subpoena and an invitation to meet and confer the following day. BK-ECF 79-3 at 2. Worms responded:

> As we say in the Yiddish, you have real chutzpah sending me this proposed subpoena especially since I have maintained all along, and have documented, that this Chapter 15 proceeding is completely illegitimate, and the Recognition Order entered by the Bankruptcy Court is null and void.
>
> Therefore, I will not be meeting and conferring with you concerning the proposed subpoena because it is my unshakable intention to move to quash the subpoena at the earliest possible moment, but in all events prior to the subpoena's return date of July 8, 2019.
>
> You and your law firm were successfully able to bamboozle an inattentive judge in signing a recognition order and to permit blunderbuss discovery in this proceeding. However, the days of you and your firm running amok in this proceeding are over. I look forward to seeing you in court at the next court appearance.

BK-ECF 83-2 at 3.

The next day, the FR served the subpoena on "Larisa Markus, c/o Victor A. Worms," which commanded production by July 9, 2019. BK-ECF 79-2 at 2 (the "Subpoena"). According to the FR, the purpose of the Subpoena was to "uncover what happened to the two billion dollars that she pled guilty to embezzling." BK-ECF 160 at 64. The FR issued the Subpoena pursuant to Federal Rule of Civil Procedure 45. BK-ECF 79-2.

The Subpoena made twenty-one requests for documents, including, for example:

1. All engagement letters of Markus with counsel, including but not limited to:
    a. Counsel in the United States:
        i. the Law Offices of Victor A. Worms;
. . .
3. All "Powers of Attorney" executed by Markus or concerning a Markus Asset.
4. All communications between Markus and [Ilya] Bykov.
. . .
9. All documents—including, but not limited to bank statements, checks, accounting, account opening documents—evidencing bank accounts in which Markus has an interest (direct or indirect).

BK-ECF 79-2 at 1–2. The Subpoena's "Instructions" specified that the "Subpoena shall apply to all documents that you, or any of your present or former agents, attorneys, assigns, consultants, employees, and/or successors possess, control or can access in the ordinary course of business." *Id.* at 9.

Between June 25, 2019 and July 9, 2019, Worms seems to have made no effort to obtain responsive documents. On July 9, 2019, Worms filed a motion to quash the Subpoena. BK-ECF 79-1. The motion argued that "[t]he subpoena should be quashed because it is predicated upon a Recognition Order which is null and void; the subpoena is procedurally deficient; it is impossible for the debtor to comply with the subpoena because she is presently incarcerated in a Russian prison and the subpoena is overly burdensome." *Id.*

On July 10, 2019, the FR filed a Declaration from Sergey Sokolov, Russian legal counsel to the FR. BK-ECF 81 (the "First Sokolov Declaration"). It stated that Markus had "issued a power of attorney to Mr. Ilya Bykov and Ms. Elena Artemyeva to represent her before third parties, including Russian and foreign courts, with, *inter alia*, the right to represent Ms. Markus in bankruptcy proceedings." *Id.* at 2. Attached to the First Sokolov Declaration was the Power of Attorney itself, on official letterhead. BK-ECF 81-2.

The next day, the FR requested a discovery conference on the motion to quash and noted that "Mr. Worms did not meet and confer on [the] motion before filing it." BK-ECF 82 at 2.

Worms responded with a request for the Bankruptcy Court to refer the case to mediation, conditional on document production being stayed pending the mediation's outcome. BK-ECF 83 at 4. Worms called it "especially noteworthy" that the FR had accused Worms of not meeting and conferring before filing the motion, because that was "simply untrue." *But see* BK-ECF 83-2 at 3 (Worms email to the FR stating, "I will not be meeting and conferring with you concerning the proposed subpoena because it is my unshakable intention to move to quash the subpoena at the earliest possible moment . . . .") The Bankruptcy Court scheduled a case management conference for July 23, 2019. BK-ECF 84.

At the conference, Worms argued that the Bankruptcy Court could not address "the issue of the motion to quash or the subpoena separate from the motion to vacate the recognition order, because the recognition order is the predicate for all these orders." BK-ECF 103 at 32. The Bankruptcy Court "overrule[d] that objection," directing that "discovery [was] going forward" despite the pendency of the motion to vacate the recognition order. *Id.* at 32–33. The Bankruptcy Court further ordered: "Mr. Worms, . . . before you leave here today, you meet and confer with [FR]. You seek to resolve . . . at least . . . what documents he wants." *Id.* And the Bankruptcy Court directed the parties to file a letter by the end of that week "as to the status of the issues about the requests for production from Mr. Worms." *Id.* As Worms continued to press his position, the Bankruptcy Court emphasized:

> I'm telling you now that you are not going to delay discovery by saying I have a motion pending to vacate recognition. That isn't happening.

*Id.* at 34.

> I'm telling you right now, I don't want to hear -- the scope of discovery is broader than the precise issues in the litigation or on recognition. Unless you have a good-faith basis to assert privilege, attorney-client privilege, you're going to produce the documents. I'm telling you in the clearest terms, and I don't want to have to tell you again, after getting letters on this, that you're not producing the

documents because you think they're overbroad or it's not specifically limited to the issues on the motion to vacate recognition.

*Id.* at 35–36.

> THE COURT: You will produce all non-privileged documents that have been requested. Do you understand that, Mr. Worms?
> MR. WORMS: Judge, I do understand.

*Id.* at 36.

> THE COURT: And I'm telling you that whether they're beyond the scope of the recognition issue, [unless] you have a good-faith basis to allege attorney-client privilege, you're going to produce them.
> MR. WORMS: Okay, Judge.

*Id.* at 36. Counsel conferred, as ordered, after the conference. BK-ECF 96, 99. But the dispute

persisted. On July 26, 2019, Worms submitted a letter advising as follows:

> In respect to the Markus subpoena, I agree to provide documents reflecting requests No. 1(a)(ii) and No. 3 to the extent any such power of attorney directly affects my authorization to represent Ms. Markus in this action.[4]

> As to the remaining documents requested in the subpoena, I do not have any documents responsive to these requests. Importantly, it is my understanding that most, if not all, of the documents which are being requested have already been provided to the Foreign Representative pursuant to subpoenas that have been served upon other parties.

> Therefore, the Following [sic] Representative is in a position to trace the assets of the debtor ahead of any mediation that may take place in these cases. In line with the meet and confer telephone call, it was agreed that I would provide copies of the documents agreed to by August 2, 2019.

BK-ECF 96. The FR filed a response letter characterizing the position that Worms's letter had

taken as refusing to produce documents "because [Worms] does not ***personally*** have responsive

documents." BK-ECF 99. The FR's letter emphasized that the Subpoena was served on Worms's

client, Markus, and that Worms was obligated to obtain responsive documents from her, as well

as her agents and attorneys. *Id.* According to the FR's letter, Worms had still not confirmed that

---

[4] Presumably, Worms intended to reference request No. 1(a)(i), which asks for all engagement letters of Markus with his office, rather than No. 1(a)(ii), which asks for the same from a different lawyer's office.

he would communicate with Markus, her agents, and her attorneys, but had stated to the FR only

that Markus was incarcerated in Russia. *Id.*

Worms rejected the FR's characterization of his position, responding as follows in a letter

also dated July 26, 2019:

> [The FR] asserted that I stated that I would not produce any documents because I **personally** do not have responsive documents. This is a complete and total falsehood because I never made any such assertion.

BK-ECF 101. On July 30, 2019, the Bankruptcy Court intervened. In an order titled, "Order for

the Production of Documents by Larisa Markus and Victor A. Worms, Esquire," the Bankruptcy

Court expressly referenced the Subpoena (BK-ECF 79-2) and ordered as follows:

> 1. The Motio[n] to Quash the Subpoen[a] (. . . Markus Case, ECF No. 79) [is] DENIED;
>
> 2. Worms shall immediately communicate with Markus and her agents, including attorneys, to obtain and produce responsive documents by the dates indicated below to [the] extent the documents are in Markus' possession, custody, or control;
>
> 3. Markus and Worms shall produce all documents responsive to the Subpoenas to the extent the documents are in their possession, custody, or control:
>
> > a. Worms shall produce by 5 p.m. on Friday, August 2, 2019, the documents responsive to . . . the subpoena in the Markus Case (Markus Case, ECF No. 79-Ex. A) Request Nos. 1(a)(i) and 3, as per his prior agreement with the Foreign Representatives;
> >
> > b. Worms and Markus shall produce all remaining responsive documents by 5 p.m. on Thursday, August 15, 2019.
>
> 4. Markus and Worms shall provide by 5 p.m. on Thursday, August 15, 2019, a log of documents withheld on privilege grounds.

BK-ECF 107 (the "July 30 Order") (emphasis removed).

On August 5, 2019, Worms submitted a letter to the Bankruptcy Court acknowledging

that "the Court, in its order of July 30, 2019, directed . . . Worms [to] immediately communicate

with Markus and her agents, including attorneys, to obtain and produce responsive documents by the dates indicated below to [the] extent the documents are in Markus' possession, custody, or control." BK-ECF 109. Worms's August 5, 2019 letter also recognized that the July 30 Order had "directed, in reference to the subpoena that was served upon Ms. Markus, . . . Markus [to] produce all remaining responsive documents by **5 p.m. on Thursday, August 15, 2019**." *Id.*

Worms's August 5, 2019 letter further explained:

> To comply with the Court's order directing communication with Ms. Markus in respect to the production of the documents which may be responsive to the subpoena, the entire subpoena, including the pro forma portions, will have to be translated into Russian and that translated subpoena will have to be reviewed by Ms. Markus.
>
> . . .
>
> This would have been an entirely different situation if Ms. Markus was incarcerated in a prison in the United States because in such a circumstance, the August 15, 2019 date would not be problematic, and her participation in responding to the subpoena could be obtained by August 15, 2019.
>
> Accordingly, I am writing to request that the Court extend the August 15, 2019 compliance date . . . to September 4, 2019 . . .
>
> I suspect that [the FR] will not object to this relatively short extension . . . because I am sure that he would like to have Ms. Markus participate in responding to the subpoena as much as is practicable under the circumstances.

*Id.* On August 7, 2019, the FR submitted a letter consenting to Worms's request for an extension from August 15 to September 4, with the exception of documents related to the motion to vacate. BK-ECF 114. The FR's letter stated that Worms had "apparently done nothing to obtain responsive documents – not translating the subpoena or communicating with Ms. Markus." *Id.*

In response, Worms filed a letter reiterating his request for an extension until September 4, 2019 "[d]ue to the logistics of translating the subpoena and having it reviewed by Ms. Markus." BK-ECF 115.

On the same day as the letter exchange—August 7, 2019—the Bankruptcy Court held a conference. The Bankruptcy Court asked Worms whether the Subpoena had yet been translated into Russian. BK-ECF 129 at 7. Worms replied that it had "been sent to a service for that purpose" but that they were "still waiting for the completion of that translation." *Id*. The Bankruptcy Court ordered Worms, by the end of that day, to file "a letter with the details of who sent the subpoena for translation, when was it sent for translation, . . . [and] when is it expected that the translation will be completed . . . [and] delivered to Ms. Markus." *Id.* at 7–8.

"And I don't want weasel words," the Bankruptcy Court emphasized. "I want direct answers, and you will be held responsible for the direct answers . . . [I]f you didn't send it, you better get very affirmative representations about who sent it, when it was sent, and when the response is expected, when it will be delivered to Ms. Markus." *Id.* The Bankruptcy Court further ordered:

> You've requested in your August 7th letter that the deadline for compliance be extended from August 15th, 2019 to September 4, 2019. That request is granted. No further extensions will be granted. So you better be sure that the subpoena is translated promptly and delivered to Ms. Markus.

*Id.* Towards the end of the conference, the Bankruptcy Court addressed discovery practice more generally:

> You all are going to change the way you have behaved in this case. Okay? I am not going to get flooded, and my courtroom deputy is not going to get flooded with emails, and copies of correspondence, okay? I'm going to start imposing sanctions if you disregard what I'm saying now. You better tell any of your other colleagues who are not on the phone today. Okay? I'm serious about it.
> . . . .
> [A]s I said, Mr. Worms, by the end of the day today, what I'm not going to put up with is you put in a letter saying, oh, we've got to translate it into Russian. But you're not the one who's handling the request. Okay? There better not be another request. You better communicate to whatever counsel is dealing with it they better be able to demonstrate they've done -- when you put in a letter that says the request was made, I want to know who the translator is, when the request was made, when the response is going to be provided.

. . . .

> We're moving forward with this case. Okay? And the first thing that's going to happen is complete compliance with discovery and stopping of the letter-writing wars.

*Id.* at 16–17. As ordered, that same day, Worms submitted a letter updating the Bankruptcy Court on the status of the translation. BK-ECF 116. The letter stated that the translation was expected to be complete on August 9, 2019 and transmitted for review by Markus on or about that day. Worms's letter concluded: "[I]t is anticipated that the review by her will be completed prior to the compliance date of September 4, 2019." *Id.*

On September 4, 2019, Worms submitted a response to the Subpoena. BK-ECF 136-2. The response lodged an objection to Request No. 1 "as exceeding the limited scope of discovery provided for under Chapter 15." *Id.* In response to each of the remaining twenty requests, Worms's response stated: "There are no documents responsive to this request." *Id*. at 2–7.

Four days later, the FR submitted another Declaration from Sergey Sokolov. BK-ECF 133-4 (the "Second Sokolov Declaration"). The Second Sokolov Declaration stated that, "according to Russian law Markus' Russian bankruptcy estate includes all her assets, including property located abroad and property put into trust such as the Larisa Markus Revocable Trust." *Id.* It also explained that, "under Russian Bankruptcy law[,] . . . once the debtor is declared bankrupt the financial administrator exercises all rights with respect to the property making up the bankruptcy estate and is entitled to collect and dispose of such property for the benefit of creditors." *Id.* It declared further that, because "[t]he Russian Federation does not have any treaties with the United States applicable to the sale of property of insolvent debtors, . . . any eventual liquidation of Ms. Markus' assets located in the United States would be governed by the procedural laws of the United States." *Id.*

The Bankruptcy Court held a hearing on September 9, 2019. BK-ECF 146. At that time, the Bankruptcy Court explained that "Federal Rule of Bankruptcy Procedure 9020 says that [Bankruptcy] Rule 9014 governs a motion for an order of contempt," and that Bankruptcy Rule 9014 requires relief to "be requested by motion." *Id.* at 15. "If you want to seek contempt, which you certainly can, you'll do it by formal motion," the Bankruptcy Court told the FR. *Id.* at 16. Then the Bankruptcy Court invited the FR to explain the status of discovery.

The FR stated that he had not received "a single document regarding Ms. Markus's assets." *Id.* at 19. He relayed that Worms had told the FR that the Subpoena was translated and sent to Russian attorneys who went to visit Markus in jail, and that Markus conveyed she "didn't have any documents because she's in jail." *Id.* The FR added that he had asked Worms whether Worms had spoken to Markus's attorneys in London, France, or Latvia, and that Worms had responded to him, "[N]o, but I don't have to tell you what I discussed with them if I had." *Id.* at 19–20.

Later in the hearing, the Bankruptcy Court asked, "Mr. Worms, why haven't you produced documents?" BK-ECF 146 at 76. Worms replied:

> Judge, I don't -- to hear [the FR] tell it, Your Honor, after the subpoena, I was supposed to fly to Russia, meet with the Russian attorneys and whomever else is in Russia, fly to Paris or France, I mean –

*Id.* at 77. The Bankruptcy Court responded:

> Mr. Worms, you understand that Ms. Markus is required to produce documents in her possession, custody, or control. She's in jail and I'm assuming she doesn't have boxes of documents or electronic data with her in jail. She has agents. Agents include her attorneys . . . [Y]ou were required to produce documents in her possession, custody, or control. Have you produced any?

*Id.* Worms answered that he had not produced any documents because there were "no documents to produce." *Id.* at 78. He then asserted that it was his "understanding" that "the scope of discovery under Chapter 15" excludes "documents in foreign countries." *Id.*

When the Bankruptcy Court asked Worms whether he had made that argument in response to prior conferences and orders, Worms replied, "I thought that was very well understood by all parties, Judge." *Id.*

When asked whether Worms had appealed the July 30 Order, Worms responded, "I didn't appeal the Court's order . . . because I understood [it to be] directed specifically at Ms. Markus, . . . that she was to respond to the subpoena. Not that I would then, in turn go on planes to Russia." *Id.* at 79. The Bankruptcy Court continued:

> What you didn't answer to me, is whether her attorneys in London or her attorneys in Moscow have any documents that are responsive to the subpoena. Do you know one way or the other whether they do?

*Id.* at 80. Worms answered, "I do not, Your Honor." *Id.* at 81. The Bankruptcy Court clarified:

> THE COURT: In response to a July 30, 2019 order, did you produce any documents from Ms. Markus?
> MR. WORMS: I did not produce any documents because there weren't documents to be produced, Judge.

*Id.* After that, the Bankruptcy Court invited the FR to "[b]ring a motion for contempt." *Id.* Soon thereafter, Worms asked if the Bankruptcy Court would "indulge [him] for one moment." *Id* at 82. Worms insisted that he "misunderstood the Court's order" and that, "at no point was it in [his] consciousness" that he was supposed to look outside the United States. *Id.* The Bankruptcy Court responded that Worms's obligations were "crystal clear from prior hearings." *Id.* at 84.

In closing, the Bankruptcy Court set a briefing schedule for the contempt motion and ordered Worms to "affirmatively indicate whether any of Markus' attorneys or agents in the United States or elsewhere have in their possession or custody, document responsive to the

subpoena." *Id.* at 93–94. The Bankruptcy Court asked Worms, "Am I clear about that?" and Worms responded, "Yes, Judge." *Id.* at 94. The record does not reflect that Worms ever made such affirmative indication about Markus' attorneys or agents.

Two days after the hearing, the FR moved for sanctions. BK-ECF 136. Worms opposed the motion and cross-moved for sanctions against the FR. BK-ECF 138. The FR replied. BK-ECF 139.

On October 3, 2019, the Bankruptcy Court held a hearing. The FR drew the Bankruptcy Court's attention to cases discussing "an obligation to produce documents no matter where they are." BK-ECF 160 at 49. The FR insisted, "There was no misunderstanding. It was deliberate. He didn't make reasonable efforts. He didn't contact lawyers." *Id.* Moreover, the FR emphasized, "even [if] Mr. Worms believed . . . that this didn't apply to documents outside of the United States, . . . [there are] ten agents of Ms. Markus that are here in the United States." *Id.* at 50.

At that point, the FR directed the Bankruptcy Court's attention to a chart he had submitted as an exhibit to the sanctions motion. *Id.* (citing BK-ECF 136-3). The chart, titled "Larisa Markus Agents (Known from Discovery)," listed thirty-one known agents of Markus and provided their contact information and locations. BK-ECF 136-3. According to the chart, Markus had fourteen agents based in the United States. *Id.*[5] The FR stated that he had given this chart to Worms. BK-ECF 136 at 50. "So even if his misunderstanding was you don't have to get documents outside the United States, there were ten agents there that he didn't contact," the FR explained. *Id.*

---

[5] For example, the third entry on the list is "Aber Business Solutions." BK-ECF 136-3. The chart states that Aber Business Solutions received payments from one of Markus's trusts. *Id.* The chart also gives its address, telephone number, and fax number. *Id.*

The Bankruptcy Court asked Worms whether he had yet provided the FR with any documents from any of Markus's attorneys in England, France, or Latvia. *Id.* at 51. Worms responded, "I wrote to them, Judge, and they told me, literally, we're not giving you anything . . . we have no obligation." *Id.* at 50–51. When the Bankruptcy Court asked whether Worms had filed anything to that effect, Worms responded, "I know I made my filing under a very rushed timetable . . . [I]f the Court would like me to supplement the record . . . I'd be happy to do that." *Id.* at 52. The Bankruptcy Court declined the offer. *Id.*

Next, Worms contested the validity of the July 30 Order on the grounds that the Bankruptcy Court had "no personal jurisdiction" over Markus. *Id.* The Bankruptcy Court rejected that argument and found the following:

> You have engaged in a knowing, intentional, persistent course of conduct in these cases, obstructing the [FR's] efforts to obtain discovery of relevant and material evidence.
> . . . .
> Here, the Sokolov declarations state that Russian law allows for . . . the discovery requested here. You have provided no evidence to rebut this assertion. Thus you have been required, consistently, to comply with the subpoena seeking information from outside the United States.

*Id.* at 55–58. Worms protested that the Subpoena "was issued to Ms. Markus" and insisted that the person subpoenaed (Markus), not he as the attorney, had "to have custody and control and possession." *Id.* at 58. The Bankruptcy Court did not disagree. *Id.* at 58–62. But, the Bankruptcy Court then asked Worms, "Is it your view that Ms. Markus can't direct her attorneys in England, France, and Latvia to produce documents?" to which Worms responded, "The answer is I don't know, because it's a factual issue that would require an evidentiary hearing and the burden of proof to be satisfied by [FR]." *Id.* at 62–63.

"Enough," said the Bankruptcy Court. *Id.* at 66. "Here, Mr. Worms has demonstrated throughout willful disregard of this Court's two discovery orders issued nearly two months ago,

and this Court's warning to Mr. Worms that sanctions might be levied against him for failure to comply with this Court's orders." *Id.* at 68. "Consequently, the Court will enter an order imposing monetary sanctions on Mr. Worms for failure to provide documents . . . on or after September 4th." *Id.*

Five days later, the Bankruptcy Court issued a written order summarizing the sanctions it had imposed orally on October 3. BK-ECF 157 ("Sanctions Order"). The Sanctions Order stated that the Bankruptcy Court was imposing sanctions "based on Mr. Worms' failure to comply with discovery orders issued by this Court" but did not identify the precise authority under which those sanctions were being issued. *Id.* The Sanctions Order further directed the following:

> [W]ithin fourteen (14) days from the date of this Order, as a sanction based on Mr. Worms' failure to comply with discovery orders issued by this Court, Mr. Worms is directed to pay to the Clerk of the United States Bankruptcy Court for the Southern District of New York $1,000 per day or a total of $34,000 since his non-compliance on September 4, 2019; and

> Mr. Worms is further ordered to pay $1,000 per day going forward for each day that he fails to comply with this Court's discovery orders.

*Id.* at 2. The Sanctions Order also promised a "separate memorandum opinion . . . elaborating on the findings of fact and conclusions of law . . . that support this sanctions award," which the Bankruptcy Court issued on October 16, 2019. *Id.*; BK-ECF 164 ("Sanctions Opinion").

The Sanctions Opinion characterized the FR's motion for sanctions as having been made "pursuant to FED. R. CIV. P. 37(b)(2)(A)(vii) and (b)(2)(C)." BK-ECF 164 at 2; *see also id.* (referencing "the Rule 37 Motion"). The Sanctions Opinion also summarized the background of the dispute—from the Bankruptcy Court's oral order on July 23, 2019 that Worms "had to produce all non-privileged responsive documents" to its written July 30 Order directing Worms to "immediately communicate with Markus and her agents, including attorneys, to obtain and produce responsive documents . . . to the extent the documents are in Markus' possession,

custody, or control." *Id.* (quoting BK-ECF 103 at 36; BK-ECF 107). In the Sanctions Opinion, the Bankruptcy Court found "as facts that Worms knowingly and intentionally—indeed brazenly—violated previous Court orders compelling compliance with discovery." *Id.* at 9. The Sanctions Opinion invoked two sources of authority for sanctioning Worms: Rule 37(b)(2)(A)(vii) and the "court's inherent power to hold a party in civil contempt." *Id.* at 20. Ultimately, the Sanctions Opinion concluded that "sanctions against Worms [were] appropriate . . . pursuant to FED. R. CIV. P. 37 *and* for civil contempt." *Id.* at 23 (emphasis added). On the same day the Sanctions Opinion issued, Worms noticed the appeal of the Sanctions Order. BK-ECF 165.

On October 23, 2019, the FR moved for an award of attorneys' fees. BK-ECF 176. The FR's motion cited Rule 37(a)(5)(A) for the proposition that "[i]f a [Rule 37] sanctions motion is subsequently granted – or even if the discovery is merely provided after the motion is filed but prior to a court order – 'the court *must*, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.'" *Id.* at 6. The FR's motion emphasized, "Such an award is mandatory." *Id.* Worms opposed the motion. BK-ECF 190. The FR filed a letter reply. BK-ECF 195.

On November 7, 2019, the Bankruptcy Court granted the FR's motion, awarding $60,000 in attorneys' fees against Worms in connection with the Sanctions Order. BK-ECF at 200 ("Fees Order"). The Fees Order explained that, in the Sanctions Opinion, "the Court found that 'Worms' willful disregard of this Court's two discovery orders issued nearly two months ago and this Court's warnings to Worms that sanctions might be levied against him for failure to comply with this Court's orders weighs heavily in favor of imposing sanctions.'" *Id.* at 2 (quoting

BK-ECF 164 at 23–24). The Fees Order specified that the Bankruptcy Court was "awarding fees against Worms personally in connection with the preparation of the Sanctions Motion, reply and argument of that motion" and that "[n]o fees are awarded other than for the Sanctions Motion, even though considerable effort was required in the effort to obtain discovery before the Sanctions Motion was prepared." *Id.* The Fees Order did not identify the authority under which fees were being awarded. Worms timely appealed. BK-ECF 204.

## II.     MATTERS BEFORE THE COURT

Pending before the Court are Worms's appeals of the Sanctions Order and the Fees Order. Worms has also moved to stay both orders pending their appeal. *See* Sanctions ECF 3; Fees ECF 4. On March 9, 2020, the Court heard oral argument on all matters. The same day, the Court requested supplemental briefing on three matters: (1) whether Rule 37 sanctions are appropriate for failure to obey a Rule 45 subpoena; (2) authority addressed to whether and when Rule 45 applies in bankruptcy proceedings; and (3) whether the Court may affirm all or part of either order on the alternative ground of Rule 45(g). Sanctions ECF 22; Fees ECF 17. Both sides timely filed supplemental letter-briefs. Sanctions ECF 23, 24; Fees ECF 18, 19.

This opinion first addresses issues common to both appeals, then those unique to the Sanctions Order, and finally those relating to the Fees Order.

## III.     STANDARD OF REVIEW

Generally, a district court reviews a "Bankruptcy Court's findings of fact for clear error [and] its conclusions of law *de novo*." *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000). "In reviewing a decision of a bankruptcy court, the district court 'may affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below.'" *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 598

B.R. 102, 111 (S.D.N.Y. 2019) (quoting *Freeman v. Journal Register Co.*, 452 B.R. 367, 369

(S.D.N.Y. 2010)). "The district court may not consider evidence outside the record." *Id.*

## IV.     ISSUES PRESENTED IN BOTH APPEALS

### A.     Whether This Court Lacks Jurisdiction Over Both Appeals Because Named Appellant Markus Has No Standing

Both notices of appeal were filed by "Larisa Markus (the 'Debtor'), by and through her

attorney, Law Offices of Victor A. Worms." BK-ECF 165; BK-ECF 204. The FR argues that this

Court now lacks jurisdiction over both appeals because Markus, the named appellant, lacks

standing.

Generally, "in order to have standing to appeal from a bankruptcy court ruling, an

appellant must be a person aggrieved—a person directly and adversely affected pecuniarily by

the challenged order of the bankruptcy court." *In re Barnet*, 737 F.3d 238, 242 (2d Cir. 2013)

(quoting *DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 89

(2d Cir. 2011) (internal quotation marks omitted)).[6] The FR asserts that Worms is the proper

appellant because the Sanctions and Fees Orders aggrieved *him*, not Markus.

Under Federal Rule of Appellate Procedure ("FRAP") 3(c)(4), "[a]n appeal must not be

dismissed for . . . failure to name a party whose intent to appeal is otherwise clear from the

notice." The Second Circuit applied that rule to a sanctions appeal nominally brought by the

client, not the lawyer, in *Guckenberger v. Prudential Ins. Co. of Am.*, 472 F. App'x 69 (2d Cir.

2012). In that case, the Court concluded that the "notice of appeal ma[de] clear that counsel

intended to be a party to the appeal because counsel alone was the subject of the court's sanction

and [the client] would have had no direct personal stake in the outcome of an appeal from the

portion of the district court's order sanctioning counsel." *Id.* at 70. Citing *Guckenberger*, the FR

---

[6] Public interest standing is not at issue in this case.

acknowledges that FRAP 3(c)(4) would save this appeal if it applied. Sanctions ECF 19 at 17. But, according to the FR, the Federal Rules of Appellate Procedure only govern bankruptcy appeals in circuit courts. *Id*. at 18.

This precise question has arisen before. *See In re Johns-Manville Corp.*, 319 F. Supp. 3d 633 (S.D.N.Y. 2018) (*rev'd on other grounds by In re Johns-Manville Corp.*, 2020 WL 815776, at *3 (2d Cir. Feb. 19, 2020)). *In re Johns-Manville Corp.* took up appeals arising from the "long-running bankruptcy" of the Johns-Manville Corporation, "once the largest supplier of raw asbestos in the United States." *Id.* at 635. In 2009, Salvador J. Parra, Jr., a former insulator who developed asbestosis, retained The Bogdan Law Firm (the "Bogdan Firm") to sue certain Manville-related entities. *Id.* at 638–38. In 2010, the Bogdan Firm filed a response to one of the entities' motions "on behalf of 'The Bogdan Law Firm as Counsel for Salvador Parra, J.'" *Id.* at 638. Litigation ensued. Eight years later, for the first time, the Manville-related entity argued that the Bogdan Firm lacked standing to pursue an appeal. *Id.* at 639.

The district court disagreed. "While formalistically appealing," the court explained, "[the entity's] argument ignores the reality that, throughout this suit, every single relevant actor - the Parra estate, the district court in the initial appeal, the bankruptcy court, and [the entity] itself - understood that Parra was the party doing the litigating, regardless of how the caption read." *Id.* The district court acknowledged that FRAP 3(c)(4) was "not technically binding," but saw "no reason the same principle it incorporates should not apply to an appeal from the bankruptcy court to the district court." *Id.* Citing *Guckenberger*, the district court added that "[m]ultiple other circuits agree" that "a notice of appeal of contempt sanctions that listed only the client" could still make "clear that counsel intended to be a party to the appeal." *Id.* at 640 (citing *Guckenberger*, 472 F. App'x at 70).

On appeal, the Second Circuit blessed that approach. *In re Johns-Manville Corp.*, 2020 WL 815776, at *1 ("Like the district court, we decline to dismiss the appeal for what can be, on this record, characterized as a captioning error.").

The holding and reasoning of *In re Johns-Manville Corp.* apply here. Worms appealed from orders titled "Order Issuing Sanctions *Against Debtor's Attorney, Victor A. Worms*, for Failure to Comply with Discovery Orders," Sanctions ECF 1; BK-ECF 165, and "Order Awarding $60,000 in Attorneys' Fees *Against Victor A. Worms, Esq.* in Connection [with] the Foreign Representative's Sanctions Motion." Fees ECF 1; BK-ECF 204 (emphasis added).

The Sanctions Order imposed, on "Mr. Worms," $34,000 in sanctions on "based on *Mr. Worms'* failure to comply with discovery orders." BK-ECF 157 at 2 (emphasis added). It further ordered "Mr. Worms" to pay $1,000 per day going forward so long as "he" failed to comply with discovery orders. *Id.* Although the introduction to the Sanctions Order described the July 30 Order as "concerning discovery to be produced by Larisa Markus and Victor A. Worms," and noted that the Bankruptcy Court had "extended Larisa Markus's deadline to produce documents," the plain decretal language of the Sanctions Order concerned only Worms. *Id.*

The Fees Order specified that the Bankruptcy Court was "awarding fees *against Worms personally*" and directed that the sum was "payable *by Worms personally* to the Foreign Representative." BK-ECF 200 at 2.

There can be no dispute that the effect of the orders was to impose pecuniary harm on Worms. Absent any ambiguity in the underlying orders, the orders put the FR on notice that Worms, not Markus, was the aggrieved party who intended to file this appeal. Jurisdiction lies here despite any "captioning error." *In re Johns-Manville Corp.*, 2020 WL 815776, at *1.

### B. Whether This Court Lacks Jurisdiction Over Challenges to the Discovery Order

In both appeals, Worms raises various challenges to the propriety of the July 30 Order. Most prominently, he insists that a subpoena issued pursuant to Federal Rule of Civil Procedure 45 cannot be used to conduct discovery in a Chapter 15 proceeding. The FR argues that Worms cannot challenge the validity of the July 30 Order in either appeal because he failed to appeal the July 30 Order within the 14 days provided by Bankruptcy Rule 8002(a)(1).[7] Worms counters that the July 30 Order was not appealable until the Bankruptcy Court issued the Sanctions Order, at which time the July 30 Order merged into the Sanctions Order for appellate review.[8]

"Under traditional finality principles, a district court's decision to compel compliance with a subpoena or to deny a motion to quash a subpoena is generally not a 'final decision' and therefore is not immediately appealable." *In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, 490 F.3d 99, 104 (2d Cir. 2007) (citation omitted). "To obtain appellate review, the subpoenaed person ordinarily 'must defy the district court's enforcement order, be held in contempt, and then appeal the contempt order.'" *Id.* (quoting *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 468 (2d Cir. 1996)). But "[t]his rule has an exception for discovery orders issued pursuant to 28 U.S.C. § 1782(a), which provides for discovery 'for use in a proceeding in a foreign or international tribunal.'" *Barnet*, 737 F.3d at 244 (citing 28 U.S.C. § 1782(a)). "Because such an order is the final adjudication of the § 1782 application, it is immediately appealable . . . regardless of the fact that the suit in another tribunal, to which it relates, remains unadjudicated." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011).

---

[7] Absent exceptions not applicable here, Rule 8002(a)(1) requires that "a notice of appeal must be filed with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed."
[8] Worms does not contest that he never timely appealed the July 30 Order.

In *Barnet*, the Second Circuit determined that "[t]he same reasoning applies in [the Chapter 15] context." 737 F.3d at 243. "Chapter 15 proceedings, like Section 1782 proceedings, are ancillary to a 'suit in another tribunal,' such that there will never be a final resolution on the merits beyond the discovery relief itself." *Id.* (citation omitted). Therefore, in *Barnet*, the court concluded that the "discovery order entered by the Bankruptcy Court was appealable." *Id.*; *see also In re Platinum Partners Value Arbitrage Fund L.P.*, 2018 WL 3207119, at *7 (S.D.N.Y. June 29, 2018) ("[T]he Court of Appeals allows appeals from discovery orders in Chapter 15 proceedings as an exception of the final order rule[.]").

Worms contends that the *Barnet* rule does not apply because the Bankruptcy Court improperly permitted discovery pursuant to Federal Rule of Civil Procedure 45 rather than Bankruptcy Rule 2004. Sanctions ECF 20 at 20. That argument exalts the form of the discovery order over its substance. The reason that discovery orders in Chapter 15 cases are appealable is because "there will never be a final resolution on the merits beyond the discovery relief itself." *Barnet*, 737 F.3d at 244. Whether the Bankruptcy Court's discovery order was issued under FRCP 45 or Rule 2004, properly or improperly, the Markus proceedings were still "ancillary to a suit in another tribunal, such that there will never be a final resolution on the merits beyond the discovery relief itself." *Id.* (citation omitted). The type of discovery order does not make Chapter 15 proceedings any more or less "like Section 1782 proceedings." *Id.* Accordingly, this Court rejects Worms's argument. The July 30 Order was immediately appealable.

That the July 30 Order was appealable at the time it was issued does not answer the question, however, of what portion—if any—of Worms's appeal is untimely. To that question, resort must be made to Bankruptcy Rule 8002(a). "[T]he time limit contained in Rule 8002(a) is jurisdictional, and . . . in the absence of a timely notice of appeal in the district court, the district

court is without jurisdiction to consider the appeal." *In re Siemon*, 421 F.3d 167, 169 (2d Cir. 2005); *see also In re Indu Craft, Inc*., 749 F.3d 107, 115 (2d Cir. 2014) (observing that *Siemon* is "consistent with those rulings of other circuits to have examined the issue"). Because Worms could have challenged the July 30 order immediately but declined or neglected to, he is now "barred from attempting to relitigate a question that was already definitively determined [and that he] failed timely to appeal." *Vermont Ry., Inc. v. Town of Shelburne*, 918 F.3d 82, 86–87 (2d Cir. 2019). Such a "question" would be any challenge to the correctness of the July 30 discovery order, including the argument that the Bankruptcy Court erred by allowing discovery pursuant to Rule 45.

But not every "question" presented by Worms's appeals of the Sanctions Order and Fees Order concerns the correctness of the underlying July 30 Order. In addressing the following issues over which the Court has jurisdiction, the Court will assume the propriety of the July 30 Order and consider only the questions whether the Bankruptcy Court erred in imposing sanctions and awarding fees.

### C. Whether the Sanctions Order is Invalid Because It Was Predicated on Rule 37

Worms argues that the Sanctions Order is invalid because it was predicated on Rule 37, which, under his interpretation, does not ever apply to Chapter 15 proceedings. The FR responds that Rule 37 sanctions are available in Chapter 15 proceedings. Although the contours of Worms's argument are less than pellucid, the Court will attempt to map out his reasoning in some detail. Importantly, this section addresses the arguments about whether Rule 37 can apply in Chapter 15 cases as a general matter; it does not discuss, as later sections of this opinion will, whether sanctions under Rule 37 were specifically appropriate in the context of *this* Chapter 15 proceeding.

Worms's argument is essentially two-fold. First, he asserts that he cannot have been held liable under Rule 37 because Bankruptcy Rule 7037 states that Rule 37 "applies in adversary proceedings" and the Chapter 15 proceedings were not "adversary proceedings" at the time the Bankruptcy Court imposed Rule 37 liability. That logic holds, as far as it goes, but it does not go very far. Bankruptcy Rule 7037 does not state that the *only* time Rule 37 applies to bankruptcy is in adversary proceedings. And Bankruptcy Rule 9014 forecloses such a reading. Bankruptcy Rule 9014, titled "Contested Matters," states under subsection (c) that, "[e]xcept as otherwise provided in this rule, and unless the court directs otherwise, [Bankruptcy Rule 7037] shall apply." Accordingly, by the plain terms of Bankruptcy Rule 9014, Bankruptcy Rule 7037 (and thereby, Rule 37) does not *only* apply to adversary proceedings. Indeed, Worms acknowledges that Bankruptcy Rule 9014(c) makes Rule 37 applicable to some contested matters.

But, Worms argues, that universe of contested matters cannot include any contested matters arising in Chapter 15 proceedings because Bankruptcy Rule 9014(b) provides that a motion under Bankruptcy Rule 9014 "shall be served in the manner provided for service of a summons and complaint by Rule 7004," and Chapter 15 notices are not served in that manner. It is undisputed that Chapter 15 proceedings are not initiated "in the manner provided for service of a summons and complaint by [Bankruptcy] Rule 7004."[9] If Bankruptcy Rule 9014 made itself applicable *only* when Bankruptcy Rule 7004 service is required, then Worms might have a winning argument. But it does not.

Bankruptcy Rule 9014(a)–(b) provides: "*In a contested matter not otherwise governed by these rules*, relief shall be requested by motion . . . [and the] motion shall be served in the manner provided for service of a summons and complaint by Rule 7004." *See also* 10 Collier on Bankruptcy P. 9014.02 (16th ed. 2019) ("As acknowledged ('not otherwise governed by these

---

[9] Rather, they are commenced pursuant to procedures under Bankruptcy Rule 2002(q).

rules') by the rule, however, there are instances in which a contested matter is initiated by some other means."). Chapter 15 proceedings are "otherwise governed by these rules"—specifically, Chapter 15 proceedings are governed by Bankruptcy Rule 2002(q) (which provides a substitute for Rule 7004 service).

Therefore, Worms is incorrect that Bankruptcy Rule 9014 is applicable *only* where Bankruptcy Rule 7004 service is required. Bankruptcy Rule 9014 (and, accordingly, Bankruptcy Rule 7037) may apply to contested matters "otherwise governed by these rules." In sum, Bankruptcy Rule 9014 makes Rule 37 (via Bankruptcy Rule 7037) applicable to contested matters in Chapter 15 proceedings.

Bankruptcy Rule 9020 is the final blow that topples Worms's house of cards. Under that rule, "Bankruptcy Rule 9014 governs a motion for an order of contempt made by . . . a party in interest." By operation of the transitive principle, Rule 37 therefore applies to Chapter 15 contested matters when a party in interest moves for an order of contempt. That is precisely the situation here.

As outlined above, Worms's argument that Federal Rule of Civil Procedure 37 does not ever apply to Chapter 15 proceedings cannot survive the plain text of the interlocking Bankruptcy Rules. That could be the end of the analysis. It is worth noting, however, that precedent and pragmatism are also against him.

On the former, courts frequently recognize that Chapter 15 proceedings can involve contested matters covered by Bankruptcy Rule 9014. *See In re Worldwide Educ. Servs., Inc.*, 494 B.R. 494, 499 n.1 (Bankr. C.D. Cal. 2013) ("Since a petition for recognition is not defined as an adversary proceeding under Rule 7001, it . . . should be treated as [a] contested matte[r] under Rule 9014."); *In re Basis Yield Alpha Fund* (*Master*), 381 B.R. 37, 43 n.14 (Bankr. S.D.N.Y.

2008) (applying Bankruptcy Rule 9014 to Chapter 15 proceeding); *In re Japan Airlines Corp.*, 425 B.R. 732, 732 n.2 (Bankr. S.D.N.Y. 2010) (same); *In re Toft*, 453 B.R. 186, 199 (Bankr. S.D.N.Y. 2011) (same); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, 2010 WL 10063842, at *1 n.1 (Bankr. S.D.N.Y. Nov. 8, 2010) (same).

And on the latter, Worms's position would lead to the absurd result that bankruptcy courts handling Chapter 15 contested matters would lack Rule 37 recourse to enforce their orders. Rule 37 is intended to address discovery misconduct. That can occur as easily in contested matters under Chapter 15 as anywhere else. It would be wholly illogical for the rulemakers to have deprived bankruptcy courts of the Rule 37 toolkit in Chapter 15 contested matters. As demonstrated above, a plain reading of the rules demonstrate that the rulemakers had no such illogical intent.

Rule 37 is available in contested matters arising within Chapter 15 cases. [10]

### D. Whether Worms Can Be Sanctioned Under Rule 37 as an Attorney

Worms argues that, even if Rule 37 applies in a Chapter 15 proceeding, he cannot be sanctioned because he (as an attorney) is not a party. The FR responds that numerous courts have sanctioned attorneys under Rule 37. Both parties paint with brushes too broad when they reference "Rule 37" as a whole. As the Second Circuit explained in *Apex Oil Co. v. Belcher Co. of New York*, Rule 37's subsections make different sanctions available for different offenders. 855 F.2d 1009 (2d Cir. 1988). "By its express terms, Rule 37(c) applies only to a party." *Id.* at

---

[10] The FR highlights that Worms's motion to quash, filed in the Bankruptcy Court on July 9, 2019, argued that "discovery from Ms. Markus has to take place pursuant to Federal Rule 26, made applicable to bankruptcy cases by Bankruptcy Rules of Procedure 7026 *and 9014*"—directly contradicting the point he makes now. BK-ECF 79-1 at 3. At oral argument, the Court inquired why Worms now asserts that Bankruptcy Rule 9014 cannot be "made applicable" to this case. He responded, "I will confess to the Court that when I made that argument it was based upon some degree of incomplete research." Sanctions ECF 25 at 16.

1014. But "other subsections of Rule 37 expressly provid[e] for the imposition of sanctions against a party's attorney." *Id.*

In this case, the Bankruptcy Court issued sanctions pursuant to Rule 37(d) and Rule 37(b)(2)(A)(vii). Those rules do permit sanctions against a party's attorney.

Rule 37(d) provides, in relevant part, as follows:

> (d) Party's Failure to Attend Its Own Deposition, Serve Answers to Interrogatories, or Respond to a Request for Inspection.
> *(1) In General.*
> (A) *Motion; Grounds for Sanctions.* The court where the action is pending may, on motion, order sanctions if:
> . . .
> (ii) a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.
> . . .
> (3) *Types of Sanctions.* Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi). Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Upon finding a violation of Rule 37(d), the Court must impose sanctions in the form of reasonable expenses on "the party failing to act" or "the attorney advising that party" or both. *See Apex*, 855 F.2d at 1014 ("Rule 37(d) . . . expressly provides that 'the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses . . . caused by the failure'").

Rule 37(b)(2)(A)(vii) and (c) provide, in relevant part, as follows:

> (b) Failure to Comply with a Court Order.
> . . . .
> (2) *Sanctions Sought in the District Where the Action Is Pending*.
> (A) *For Not Obeying a Discovery Order*. If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)— fails to obey an order to provide or permit discovery, including an order under

Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

. . . .

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

. . . .

(C) *Payment of Expenses*. Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Thus, in language identical in all respects to that which the *Apex* court found permitted the imposition of sanctions against attorneys under Rule 37(d), Rule 37(b)(2)(C) also permits the imposition of sanctions against attorneys. *See also J. M. Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338, 344 (D. Conn. 1981) (Cabranes, J.) ("If an attorney is responsible for the failure to provide discovery, Rules 37(b) and 37(d) permit the court to hold that attorney personally liable for the award of fees and expenses.").

Accordingly, Worms is incorrect that these rules only apply to parties in an action and not their attorneys. The Bankruptcy Court properly read them to cover "attorney[s] advising . . . parti[es]" as well. Fed. R. Civ. P. 37(d), (b)(2)(C).

**E.     Whether Worms Can Be Sanctioned Under Rule 37 as an Attorney for a Person Who Received a Rule 45 Subpoena**

Worms also argues that he cannot be sanctioned under Rule 37 because the Subpoena was not directed to his client, Markus, as a "party" to the Chapter 15 proceeding, but rather was served on her as a non-party pursuant to Rule 45. Fed. R. Civ. P 37(d); 37(b)(2)(A)(vii).

Rule 26 permits discovery directed to parties. Rule 45 covers discovery directed to "person[s]," which usually means non-parties. Rule 26 and Rule 45 have different enforcement regimes. Rule 26 gives the court authority to impose sanctions when a party violates a court order or fails to respond to discovery requests. The court's authority under Rule 45 is more

limited. Rule 45(g), made applicable to bankruptcy proceedings through Bankruptcy Rule 9016, provides as follows:

> The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

Thus, ordinarily and outside the bankruptcy process, a court cannot impose Rule 37 sanctions for failure of a non-party to comply with a Rule 45 subpoena. *See Madigan v. Bronstein*, 2018 WL 1768283, at *2 (S.D.N.Y. Apr. 12, 2018) ("Rule 37 applies to a *party*'s failure to comply with a discovery order, while Rule 45 addresses a *non-party*'s failure to comply with a discovery subpoena.") (emphasis in original); *In re Dunne*, 2018 WL 4654698, at *8 (D. Conn. Sept. 27, 2018) ("[T]he majority of district courts in the Circuit have found that Rule 37 cannot support sanctions for a non-party's failure to comply with a Rule 45 subpoena.") (citing cases). The FR acknowledges that Rule 37 does not normally apply to Rule 45 subpoenas served on non-parties. But, the FR argues, Rule 37 applies here because Markus *is* a party to the contested matter arising under this Chapter 15 case. Worms has the better of this argument.

Black's Law Dictionary defines a "party" as "[o]ne by or against whom a lawsuit is brought; anyone who both is directly interested in a lawsuit and has a right to control the proceedings, make a defense, or appeal from an adverse judgment." Black's Law Dictionary (11th ed. 2019). To determine whether Markus was a "party" whose attorney was punishable under Rule 37, it is important to identify the context in which the discovery was requested and the discovery orders were entered, *i.e.*, the context in which Worms elicited sanctions. Context matters because Chapter 15 proceedings contain multitudes. Many discovery proceedings in Chapter 15 cases are inquisitorial in nature, rather than adversarial. *See* 1 Collier on Bankruptcy 13.07 (16th ed. 2020) ("Section 1521(a)(4) authorizes the court to give the foreign representative

the power to engage in discovery, without the necessity of opening formal litigation. This broad power of examination gives the foreign representative investigative powers similar to a trustee."). But, at the same time, Chapter 15 cases may develop, within them, mini-disputes known as "contested matters." *See, e.g.*, *In re China Med. Techs., Inc*., 522 B.R. 28, 30 (Bankr. S.D.N.Y. 2014), *rev'd on other grounds and remanded*, 539 B.R. 643 (S.D.N.Y. 2015) (addressing a "contested matter in the chapter 15 case"); *see also In re Petroforte Brasileiro de Petroleo Ltda*., 530 B.R. 503, 505 (Bankr. S.D. Fla. 2015) (addressing "pending contested matter in this chapter 15 bankruptcy case").

In contested matters, "there are (at least) two parties who are opposing each other with respect to relief sought by one of them." 10 Collier on Bankruptcy 9014.01 (16th ed. 2020). It is clear that, by the time the Bankruptcy Court entertained the FR's motion for sanctions, a contested matter had developed. The FR was one party to that contested matter; Worms was the other. *See In re Texaco Inc.*, 182 B.R. 937, 945 (Bankr. S.D.N.Y. 1995) ("A contempt proceeding constitutes a contested matter[.]") (quoting *Collier Bankruptcy Practice Guide* ¶ 40.06 at 40–18); *In re St. Johnsbury Trucking Co., Inc*., 1994 WL 832007, at *1 (Bankr. D. Vt. Nov. 1, 1994) (applying the "rules applicable to a contested matter" to a sanctions proceeding). It is not so clear, however, whether Markus was a "party" either at the time the Subpoena was served or at the time the Bankruptcy Court entered the discovery orders that formed the basis for the Bankruptcy Court's Sanctions Order. Whether Markus was a "party" at those times is the critical question. If she was not served as a "party," then Rule 37 sanctions addressing discovery abuse by a party (and that party's attorney) cannot apply.

At first glance, the definition of a contested matter makes it sound as though any person involved in one is a "party" (at least to that contested matter) as contemplated by Rule 37. But

that cannot be correct. A plaintiff and a non-party Rule 45 subpoena recipient may "oppos[e] each other with respect to relief sought by one of them," but that dispute does not turn the non-party subpoena recipient into a "party" who is then sanctionable under Rule 37. If disobeying a Rule 45 subpoena made a non-party into a "party" sanctionable under Rule 37, then Rule 45(g)'s provision allowing courts to hold in contempt "person[s]" who fail to "obey the subpoena or an order related to it" would be mere surplusage. Moreover, it would subject the attorneys of all Rule 45 contemnors to sanctions, *see supra* IV(D) (explaining that Rules 37(d) and 37(b)(2)(C) cover "attorney[s] advising . . . parti[es]"), which Rule 45's plain text simply does not do.

Rule 37 contains "specific deterrents" which are designed, in part, to ensure that a "*party* will not be able to profit from its own failure to comply.*" Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979) (emphasis added). Rule 45, designed with non-parties in mind, offers a different type of enforcement regime. Commentary on Rule 45 makes that clear:

> When the subpoenaed person is not a party to the action, the threat of contempt is the only remedy, whether the disobedience is of the subpoena itself or of a court order entered somewhere further along the way directing the nonparty to do something. With a party there may be a variety of other sanctions available as well—in the case of a party, more often for the disobedience of a court order than of a subpoena—up to and including the declaration of a default, *see* Rule 37(b)(2), but these are threats that impact on the party's interests in the action and they therefore hold no terror for a nonparty. Hence the special role that contempt plays in enforcing subpoenas against nonparty witnesses.

Fed. R. Civ. P. 45 Practice Commentaries by David D. Siegel, Subdivision (e), C45-26 Contempt; *see also Coan v. Dunne*, 602 B.R. 429, 436 (D. Conn. 2019) ("[W]hile Rule 45 sanctions begin and end with contempt, a contempt sanction is only one form of discovery sanction available under Rule 37."). The fact that Markus (through Worms) opposed the

document production sought by the FR's Rule 45 subpoena—in a dispute that may be characterized as a "contested matter"—does not turn Markus into a "party" for Rule 37 purposes.

The Court is not persuaded by the two other arguments from the FR in support of its position that Markus is a party: (1) Markus admitted she was a party and (2) the July 30 Order was an unambiguous discovery order that was followed up with several contempt warnings. First, Markus does not have authority to adjudicate her own status. Second, the July 30 Order was issued to enforce a *Rule 45 subpoena*. The July 30 Order was the precise type of order contemplated by Rule 45's enforcement mechanism: Rule 45(g) (providing that the court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena *or an order related to it*") (emphasis added). Rule 37 does not have exclusive jurisdiction over sanctioning noncompliance with an unambiguous discovery order. Sanctions ECF 23 at 2.

The Court has been given no reason to believe that Markus, as the debtor in a Chapter 15 proceeding, was a "party" under Rule 37. Ultimately, the FR made the decision to serve her with a Rule 45 subpoena and the Bankruptcy Court endorsed that decision in the July 30 Order.[11] What is sauce for the goose is sauce for the gander. Having chosen to serve a Rule 45 subpoena, and not having treated Markus as a party upon whom a discovery request must be served under Rule 26, the FR must live with the consequences. For the reasons explained above, those

---

[11] As discussed *supra* at IV(A), Worms has relinquished his right to challenge the validity of the July 30 Order, and therefore, the propriety of the Rule 45 subpoena. The Court is dubious that Markus's challenge to the recognition order gave the FR the authority and the responsibility to use the tools of the Federal Rules of Civil Procedure, as incorporated into the Bankruptcy Rules, to obtain information after that contested matter was concluded. Although Bankruptcy Rule 9014 suggests that many of the Federal Rules of Civil Procedure would be applicable in litigation to resolve the challenge to the recognition order, *see In re Dynegy, Inc.*, 770 F.3d 1064, 1069 (2d Cir. 2014), there is nothing in that Bankruptcy Rule or the commentary to it that would suggest that *after* the resolution of such a challenge, everything in the Chapter 15 proceeding continues to be a contested matter. *See* Collier on Bankruptcy, Administration of Cases Under the Bankruptcy Code (16th ed 2020) (noting that bankruptcy cases "frequently involve significant controversies" that "do not technically qualify as 'contested' or 'adversary' proceedings" even though they are "adversarial in nature" and "often more important to the case's outcome than formal contested proceedings").

consequences include that the FR cannot use Rule 37 to hold Worms in contempt. The Bankruptcy Court's inability to sanction Worms under Rule 37 is relevant to the Sanctions Order and to the Fees Order, as will be explained below. The Court now turns to each of those individually, in order to address the remaining and distinct issues they present.

## V.     SANCTIONS ORDER

### A.     Standard of Review

"[T]he decision to impose sanctions is uniquely within the province of a bankruptcy court." *In re Highgate Equities, Ltd.*, 279 F.3d 148, 152 (2d Cir. 2002). Indeed, as the Second Circuit has recognized, "[t]he [bankruptcy] court is better situated than [a] court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard that informs its determination as to whether sanctions are warranted." *Id.* (quoting *Sussman v. Bank of Israel*, 56 F.3d 450, 456 (2d Cir. 1995)). Still, appellate review must "ensure that any such decision is made with restraint and discretion." *Id.* Accordingly, "[t]he abuse of discretion standard governs the review of the bankruptcy court's imposition of sanctions." *Matter of Ngan Gung Rest., Inc.*, 195 B.R. 593, 596 (S.D.N.Y. 1996) (Koeltl, J.). "[A bankruptcy] court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *In re Highgate Equities, Ltd.*, 279 F.3d at 152 (quoting *Sussman*, 56 F.3d at 456).

The Court first addresses the Bankruptcy Court's factual assessment of the record and then turns to the question whether the Bankruptcy Court committed legal error.

### 1.     Whether Worms Failed to Comply with Discovery

Although Worms has offered variations on the theme that the Bankruptcy Court never should have ordered him to comply with the Subpoena, he has not argued that he, in fact,

complied with it. *See, e.g.*, BK-ECF 79 (Worms's motion to quash, arguing that "the subpoena should be quashed because the Recognition Order upon which it is based is null and void and should be vacated"); *id.* (arguing that the subpoena should be quashed "because the Bankruptcy Court did not have personal jurisdiction over Ms. Markus when that order was issued"); *id.* (arguing that "it is impossible for Ms. Markus to comply with the subpoena because she is presently incarcerated in a Russian prison and is not within the territorial jurisdiction of the Southern District of New York"); *id.* (arguing that "the subpoena is overly broad and burdensome"); BK-ECF 83 (letter from Worms to Bankruptcy Court accusing the FR of "abus[ing] the subpoena power by serving a subpoena which is procedurally deficient and cannot be used to conduct a 2004 examination in support of any efforts to locate assets of Ms. Markus"); BK-ECF 96 (letter from Worms to Bankruptcy Court arguing that "most, if not all, of the documents which are being requested have already been provided to the Foreign Representative pursuant to subpoenas that have been served upon other parties").

### 2. Whether Worms Could Not Comply with Discovery

Worms argues that the Bankruptcy Court erred in sanctioning him because the FR did not satisfy its burden of demonstrating that the documents requested in the Subpoena were within Markus's possession, custody, or control.

Under Rule 34(a)(1), a party may serve a request for production of documents "in the responding party's possession, custody, or control." And, to be sure, "[t]he party seeking the production bears the burden of demonstrating that the other party has control over the documents sought." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006). Moreover, "[i]mpossibility of compliance with a court's production order is a defense to a citation for contempt." *In re Three Grand Jury Subpoenas*, 847 F.2d 1024, 1029 (2d Cir. 1988).

In this case, the Subpoena stated:

> The Subpoena shall apply to all documents that you, or any of your present or former agents, attorneys, assigns, consultants, employees, and/or successors possess, control or can access in the ordinary course of business.

BK-ECF 79-2. Similarly, the Bankruptcy Court's July 30 Order directed that "Markus and Worms shall produce all documents responsive to the Subpoenas to the extent the documents are in their possession, custody, or control." BK-ECF 107.

The Bankruptcy Court properly found that at least some of the requested documents were under Markus's "control," as that term is defined in the caselaw. In the Second Circuit, Rule 34 is governed by the following principles:

> [A] party is not obliged to produce, at the risk of sanctions, documents that it does not possess or cannot obtain . . . However, if a party has access and the practical ability to possess documents not available to the party seeking them, production may be required.

*Shcherbakovskiy v. Pa Capo Al Fine, Ltd*., 490 F.3d 130, 138 (2d Cir. 2007).

"'Control' has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand." *Dietrich v. Bauer*, 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000), *on reconsideration in part*, 198 F.R.D. 397 (S.D.N.Y. 2001). "Documents in the possession of a party's attorney may be considered to be within the control of the party." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 190 (S.D.N.Y. 2013) (Kaplan, J.) (quoting 7 Moore's Federal Practice § 34.14[2][c], at 34–80). "The . . . application of the concept [of 'control'] is often highly fact-specific." 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2210 (2d ed. 1994).

At the October 3, 2019 hearing and again in the Sanctions Order, the Bankruptcy Court cited its own comprehensive *In re Lozano* opinion to support the determination that the "control" test was satisfied here. 392 B.R. 48 (Bankr. S.D.N.Y. 2008). As *Lozano* explained, "In

*Shcherbakovskiy*, the Second Circuit appears to have adopted . . . the view that a party may be required to produce documents that it has the practical ability to obtain." *Id.* at 55 (citing 490 F.3d at 138).[12]

    *Lozano* also illustrates the fact-specific application of the "control" test. The Bankruptcy Court there explained:

> [I]n the context of a case such as this one, if the assignee of the original mortgagee, or the current loan servicer, can by custom or practice in the mortgage business informally request and obtain the original loan file, and any related documents, including a payment history, I would conclude that such documents are within the control of the party to whom the discovery request is directed.

*Id.* at 56. "But," the Bankruptcy Court continued, "the Court has no basis in the record to conclude that contract, agency or custom and practice in the business supports imposing th[e] production obligation [at issue]." *Id.* at 56–57. That "obligation" was for current mortgage handlers (a servicer and bank) to produce the loan originator's "loan manuals and information regarding its use of mortgage brokers in general and [one mortgage broker] in particular." *Id.* at 56.

    The dispositive factual distinction between the production obligation in *Lozano* and the one here is that, there, the current mortgage handlers "disclaim[ed] having any agency or servicing relationship with [the loan originator] relating to the specific mortgages at issue," *id.* at 50, whereas here, the subpoenaed party (Markus) never disclaimed having any agency relationship with the third parties from whom the Subpoena sought documents. To the contrary, there is record evidence here supporting the existence of an agency relationship between Markus and the third parties. For example, Request No. 4 asked for "[a]ll communications between

---

[12] *Shcherbakovskiy* noted, "We also think it fairly obvious that a party also need not seek such documents from third parties if compulsory process against the third parties is available to the party seeking the documents." 490 F.3d at 138. *Lozano* observes that the "compulsory process" portion of *Shcherbakovskiy* is dicta and adds that "[n]o authority is cited supporting the statement that a party need not seek documents from third parties if compulsory process is available to the party seeking production." 392 B.R. at 58.

Markus and Ilya Bykov." BK-ECF 79-2. The First Sokolov Declaration states that Markus had

"issued a power of attorney to Mr. Ilya Bykov . . . to represent her before third parties, including

Russian and foreign courts, with, *inter alia*, the right to represent Ms. Markus in bankruptcy

proceedings."[13] BK-ECF 81.[14]

Worms suggests that it is unclear which country's law would apply to determine whether

Markus has the legal right to obtain the documents requested in the Subpoena. Maybe so. But as

of July 10, 2019, Worms was made aware—through both the sworn testimony of an attorney

specializing in Russian bankruptcy law, and through the actual documentary exhibit—that

Markus had executed a power of attorney under Russian law to Bykov. *See* BK-ECF 81;

BK-ECF 81-2. He never controverted its factual existence or legal effect. Accordingly, he will

not be heard now to complain that the FR failed to satisfy its burden of showing that Markus had

"control," via agents, of at least some documents sought by the Subpoena. As the Bankruptcy

Court properly found, "the Sokolov Declarations state that Russian law allows for the discovery

requested here." BK-ECF 164.

In sum, Worms forfeited his right to challenge the sufficiency of the FR's showing that

documents requested by the Subpoena were within Markus's "control." Even if he had not, the

Bankruptcy Court was well within its discretion to conclude that the Subpoena properly

compelled production of documents from third parties with agency relationships to Markus. The

Bankruptcy Court's factual findings are not clearly erroneous. Worms failed to comply with the

Subpoena or the July 30 Order without justification.

---

[13] Because this is ultimately a case about sanctions, it is also worth highlighting the reasonableness and particularity with which the subpoenaed parties in *Lozano* handled their discovery obligations—in contrast to Worms. There, the subpoenaed parties did "not object to producing documents in their possession relating to the mortgage loans that they [owned] or service[d] relating to two properties [at issue]" but affirmatively "den[ied] having the legal right or authority to obtain documents from [the loan originator]" and therefore challenged that request. 392 B.R. at 48, 50, 53. Here, Worms refused to produce anything.
[14] The Subpoena expressly provided for a privilege log. BK-ECF 79-2. Worms does not rely on privilege in challenging his obligation to produce documents.

### 3.       Legal Authority for Sanctions

"[A bankruptcy] court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law." *In re Highgate Equities, Ltd.*, 279 F.3d at 152 (quoting *Sussman*, 56 F.3d at 456). The FR cited three sources of authority for sanctions against Worms: Rule 37, Rule 45, and the Bankruptcy Court's inherent power. *See* BK-ECF 136 at 2, 6 (motion for sanctions arguing "The Court Should Award Sanctions Under Rule 37 and Rule 45); *id.* at 21 (citing *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966) for the proposition that "[t]here can be no question that courts have *inherent power* to enforce compliance with their lawful orders through civil contempt") (emphasis added). The Bankruptcy Court relied on two of those in its Sanctions Opinion: Rule 37 and inherent power.

Although it is often the case that an appellate court may "affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the [previous] court did not rely," *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quoting *Cromwell Assocs. v. Oliver Cromwell Owners, Inc.*, 941 F.2d 107, 111 (2d Cir. 1991)), the Second Circuit has said that the "Bankruptcy Court's discretion to award sanctions may be exercised only on the basis of the specific authority invoked by that court." *In re Kalikow*, 602 F.3d 82, 96 (2d Cir. 2010). Therefore, the Court must determine whether sanctions are justified on either of the "specific authorit[ies]" the Bankruptcy Court invoked. *Id.*

Relatedly, "[d]ue process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions." *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 117 (2d Cir. 2000) (quoting *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997) (emphasis omitted)). "More specifically . . . [an] attorney whom the court proposes to sanction must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct

will be assessed, and an opportunity to be heard on that matter, and *must be forewarned of the authority under which sanctions are being considered*, and given a chance to defend himself against specific charges." *Id.* (internal quotation marks and citation omitted) (emphasis added). "At a minimum, the notice requirement mandates that the subject of a sanctions motion be informed of: (1) the source of authority for the sanctions being considered; and (2) the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense." *Id.*

For the reasons discussed above, *supra* IV(E), Worms's noncompliance with the Bankruptcy Court's orders did not warrant Rule 37 sanctions because the Bankruptcy Court's orders were issued to enforce a Rule 45 subpoena that was served on a non-party. Therefore, the question is whether the Sanctions Order can be affirmed based on its invocation of the Bankruptcy Court's inherent power.

### a) Notice

At oral argument, Worms insisted that had not received adequate notice that the Bankruptcy Court was issuing sanctions pursuant to its inherent authority. *See* Sanctions ECF 25 at 13 ("The due-process requirements require that the person to be sanctioned be put on notice as to why he is being sanctioned and the rule under which he is being sanctioned . . . And I will tell you, Judge, . . . you will see that [the Bankruptcy Court] doesn't explicitly rely upon his inherent authority."); *id.* at 14 ("[I]t is clear from his own order that he was relying upon Rule 37."); *id.* ("I've read it multiple times -- I don't see where he is relying upon his inherent authority to impose sanctions."); *id.* ("Not that he couldn't have imposed sanctions under some variant of not relying upon Rule 37, but that's what he did, Judge."). As noted above, Worms is correct that a person has the right to know the authority under which he or she is being sanctioned. But Worms

is ultimately incorrect that the Bankruptcy Court failed to give him adequate notice of the authority under which he would be sanctioned.

It is true that the FR's motion for sanctions primarily relied on the Bankruptcy Court's authority under Rule 37 and Rule 45. *See* BK-ECF 136. But in a section titled, "Mr. Worms Should Be Held in Continuing Contempt Until He Contacts All of Markus' Agents and Attorneys, Obtains Responsive Documents, and Reports His Efforts in Detail to the Court," the motion cites *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966) for the proposition that "[t]here can be no question that courts have *inherent power* to enforce compliance with their lawful orders through civil contempt." *Id.* at 21 (emphasis added). Standing alone, it is not entirely clear whether that reference would objectively suffice to put someone on notice that he might be subjected to inherent-authority sanctions. But it did suffice to put Worms on notice. Worms's briefing to this Court states that the FR "made a motion for contempt against Mr. Worms *based upon the Bankruptcy Court's inherent authority*." Sanctions ECF 15 at 20 (emphasis added).

The purpose of the notice requirement is to give the person liable for sanctions an opportunity to respond. *See In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 117 ("[T]he notice requirement mandates that the subject of a sanctions motion be informed . . . *so that the subject of the sanctions motion can prepare a defense*.") (emphasis added). Because Worms understood that the FR was moving for sanctions based on the Bankruptcy Court's inherent authority, he had that opportunity. Furthermore, Worms knew that the Bankruptcy Court would address any sanctions issue by way of "formal motion." BK-ECF 146 at 16 (transcript of September 9, 2019 hearing). On September 9, 2020—a month before the Bankruptcy Court imposed sanctions—the Bankruptcy Court advised the FR, "If you want to seek contempt, which you certainly can, you'll do it by formal motion." *Id.* Accordingly, Worms was aware that the Bankruptcy Court planned

to assess sanctions based on the *content* of the FR's motion (to which, again, Worms had an opportunity to respond). The Court need not decide whether these precise facts would put a hypothetical person on notice. Worms's concession reveals that he understood the motion for sanctions to be (in part) pursuant to the Bankruptcy Court's inherent authority. The notice requirement is satisfied.[15]

Worms's suggestion that he did not know or have an opportunity to respond to the threat of being sanctioned pursuant to the Bankruptcy Court's inherent authority is rejected.

### b)    Propriety of Inherent Authority Sanctions

Early into oral argument before this Court, Worms stated: "There is no dispute, your Honor, that a Court has inherent jurisdiction to impose sanctions." Sanctions ECF 25 at 7. "I don't dispute that, Judge," he continued. *Id.* "I have never disputed a Court's inherent authority to enforce its order." *Id.* Later in the argument, Worms repeated: "I don't dispute that [the Bankruptcy Court] would have inherent authority." *Id.*at 11. Worms explained further that if the Bankruptcy Court had been relying on its inherent authority, "we would have a totally different discussion about the sanctions that were imposed . . . because there would be no dispute about that inherent authority." *Id.* The Court asked Worms, "Do you agree with me, sir, that if the Court ordered you to contact, for example, Ms. Markus' representatives, and you didn't make any effort to contact Ms. Markus' representatives, that the Court would have the inherent power to sanction you for that?" *Id.* at 12. Worms replied, "To the extent that I deliberately and

---

[15] It is not entirely clear why Worms, at oral argument, focused on the content of the Bankruptcy Court's Sanctions Opinion when protesting his lack of notice. The Sanctions Opinion was issued after the Bankruptcy Court entered the Sanctions Order (from which this appeal was brought) and therefore offers little to the notice analysis. Nevertheless, Worms is incorrect about the Bankruptcy Court's failure to mention inherent authority in the Sanctions Opinion. The Sanctions Opinion spends many pages describing the decision to impose sanctions pursuant to inherent authority. *See* BK-ECF 164 at 19–25. "Courts have embraced the *inherent contempt authority* as a power 'necessary to the exercise of all others,'" the Sanctions Opinion explains. *Id.* (emphasis added) (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994)). The Sanctions Opinion continues, "A court's *inherent power* to hold a party in civil contempt may be exercised only when [three factors are met]." *Id.* at 21 (emphasis added). Then the Sanctions Opinion described why each of the three factors was met. *Id.*

intentionally violated the court order and to the extent that the Court is imposing a discovery violation on me, then the Court could sanction me for that violation." *Id.*

Despite Worms's position at oral argument, his supplemental briefing to the Court now argues that the "Bankruptcy Court'[s] inherent authority . . . cannot provide a legal basis to sanction Mr. Worms." Sanctions ECF 24 at 3. To support his position, Worms cites 11 U.S.C. § 105(a), the provision of the Bankruptcy Code giving the bankruptcy court authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* Worms insists that there has been no assertion that he violated any sections of the Bankruptcy Code. Worms is incorrect to look at Section 105(a).

"The majority of cases conclude that all courts, whether created pursuant to Article I or Article III of the Constitution, have inherent civil contempt power to enforce compliance with their lawful judicial orders, and no specific statute is required to invest a court with civil contempt power." 2 Collier on Bankruptcy P. 105.02 (16th ed. 2020). The Second Circuit definitively joined this majority position when it decided *In re Sanchez*, 941 F.3d 625 (2d Cir. 2019). In *Sanchez*, the Second Circuit explained that "inherent sanctioning powers are not contingent on Article III, but rather are, as their name suggests, inherent in the nature of federal courts as institutions charged with judicial functions." *Id.* at 627. "We therefore hold that bankruptcy courts, like Article III courts, possess inherent sanctioning powers." *Id.* Worms's argument that the "inherent authority of a bankruptcy court is far more restricted that a district court because that inherent authority is defined by statute" ignores binding circuit authority. Sanctions ECF 24 at 3. The Bankruptcy Court had "inherent sanctioning powers." *Sanchez*, 941 at 627.

### 4.      Whether the Bankruptcy Court's Factual Findings Were Proper

"A contempt order" issued pursuant to a court's inherent authority "is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict." *King v. Allied Vision, Ltd*., 65 F.3d 1051, 1058 (2d Cir. 1995). "More specifically, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Id.* When reviewing courts assess the imposition of sanctions, they ordinarily consider: (1) the willfulness of the conduct, (2) the efficacy of lesser sanctions, (3) the duration of the non-compliance, and (4) whether the litigant was warned of the consequences of non-compliance. *See Agiwal v. Mid Island Mort. Corp*., 555 F.3d 298, 302-03 (2d Cir. 2009).

The Bankruptcy Court made factual findings with respect to each of these elements—all of which are well supported by the record.

#### a)      Clear and Unambiguous Order

The Bankruptcy Court properly concluded that the orders Worms disobeyed were "clear and unambiguous." *King*, 65 F.3d at 1058. The text of the July 30 Order need not be reprinted here; its terms were plain. Similarly, the Bankruptcy Court's instructions at subsequent hearings were unmistakable. This requirement is satisfied.

#### b)      Clear and Convincing Proof of Noncompliance

The Bankruptcy Court also properly found that "the evidence of Worms' noncompliance [was] clear and convincing." BK-ECF 164 at 23; *see King*, 65 F.3d at 1058. In the July 30 Order, Worms was directed to "immediately communicate with Markus and her agents, including attorneys, to obtain and produce responsive documents" and to "produce all documents

responsive to the Subpoenas to the extent the documents are in their possession, custody, or control." BK-ECF 107. Even if Worms, at that time, labored under the (unjustifiable) misimpression that the Bankruptcy Court's order extended only domestically, the evidence reflects that he failed to contact Markus's domestic agents. *See* BK-ECF 136–3. The Bankruptcy Court's finding of noncompliance was supported by the record.

### c) No Diligent Attempt to Comply in a Reasonable Manner

Worms, from the outset, refused to comply with his discovery obligations. The Bankruptcy Court offered him numerous opportunities to be heard and to cure his noncompliance. Worms flouted the Bankruptcy Court's authority. Indeed, Worms put on a seemingly inexhaustible parade of excuses. None prevailed and many were plainly non-meritorious. *See Shcherbakovskiy v. Seitz*, 2010 WL 3155169, at *12 (S.D.N.Y. July 30, 2010), *aff'd*, 450 F. App'x 87 (2d Cir. 2011) (finding the "ever-changing nature of Plaintiff's objections to Defendants' requests for . . . documents and the lateness of his reliance on [a 'possession, custody, or control' argument] to strongly suggest Plaintiff's objections were manufactured for the purpose of avoiding his production obligations").

This is not a case, like *Lozano*, where a party objected to particular requests with legal reasoning that was defensible or at least non-frivolous. Worms, from the beginning, wholesale refused to comply with the Subpoena and with the Bankruptcy Court's orders. The Bankruptcy Court suitably described his behavior as "stonewalling" and "bury[ing] his head in the sand." BK-ECF 164 at 4. This finding, too, is supported by the record.

### d) Willfulness

For the same reasons above, the Bankruptcy Court's finding of "willful disregard" in this case is supported by the record. BK-ECF 164 at 17.

### e)    Efficacy

Financial sanctions, as a category, are relatively mild. *See Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1066. Here, the Bankruptcy Court appropriately escalated its efforts to procure compliance from Worms—from warnings to written orders to, ultimately, financial sanctions. As a category, then, the efficacy of financial sanctions counsels affirmance. However, Worms presents the question whether the Bankruptcy Court here improperly imposed criminal, rather than civil, financial sanctions. That will be discussed below.

### f)    Duration

By the time the Bankruptcy Court issued its Sanctions Opinion, Worms had been in contravention of the extended deadline from the July 30 Order for nearly two months. That duration of time supports sanctions, as the Bankruptcy Court concluded. BK-ECF 164 at 17 (citing *Funk v. Belneftekhim*, 861 F.3d 354 (2d Cir. 2017) (one or two months is sanctionable)).

### g)    Warnings

As the Bankruptcy Court found, Worms received ample warning that his noncompliance would result in sanctions. *See*, *e.g.*, BK-ECF 129 at 9 (Bankruptcy Court statement at August 7, 2019 hearing: "If you don't comply with orders I've entered, you do so at your own risk. And that risk is the risk of imposing sanctions. I don't like to do that, but I expect my orders to be followed."); BK-ECF 146 at 84 (Bankruptcy Court permitting the FR, at September 9, 2019 hearing, to file a motion for contempt).

For the foregoing reasons, the Court finds no basis to disturb the Bankruptcy Court's exercise of its inherent authority to sanction Worms.

### 5. Criminal Versus Civil Sanctions

There is a remaining objection to the Sanctions Order, relating to the type of punishment it imposed. Worms insists that the Bankruptcy Court improperly held him in criminal contempt, in violation of his due process rights and in excess of the Bankruptcy Court's jurisdiction, Specifically, Worms highlights the following portion of the Bankruptcy Court's Sanctions Order:

> NOW, THEREFORE, within fourteen (14) days from the date of this Order, as a sanction based on Mr. Worms' failure to comply with discovery orders issued by this Court, Mr. Worms is directed to pay to the Clerk of the United States Bankruptcy Court for the Southern District of New York $1,000 per day or a total of $34,000 since his non-compliance on September 4, 2019 . . . .

BK-ECF 157 at 2. "The question whether bankruptcy judges possess criminal contempt power is an unsettled and divisive question among the lower courts." John A. E. Pottow & Jason S. Levin, *Rethinking Criminal Contempt in the Bankruptcy Courts*, 91 Am. Bankr. L.J. 311, 313 (2017); *see also* 10 Collier on Bankruptcy P. 9020.01 (16th 2019) ("There may be a split developing among the circuits as to whether a bankruptcy court can punish criminal contempt."); *In re Ragar*, 3 F.3d 1174, 1177 (8th Cir. 1993) (noting that the question has "divided the Circuits").

Even if bankruptcy courts have authority to impose criminal sanctions, the Bankruptcy Court here could not properly have done so because it applied a "clear and convincing" evidence standard, rather than finding Worms guilty of contempt "beyond a reasonable doubt." BK-ECF 164 at 23. *See Matter of Ngan Gung Rest., Inc.*, 195 B.R. at 597 ("In this case, the Bankruptcy Court found the debtor guilty of contempt only by 'clear and convincing evidence,' and not 'beyond a reasonable doubt,' which would be required for a finding of criminal liability."). Having determined that the Bankruptcy Court could not have properly

issued criminal sanctions here, the question remains whether the sanctions it imposed were criminal or civil in nature.

"Although the procedural contours of the two forms of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear." *Bagwell*, 512 U.S. at 827. "Criminal contempt is a crime in the ordinary sense." *Id.* (quoting *Bloom v. Illinois*, 391 U.S. 194, 201 (1968)). "[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Id.*

### a) Stated character and purpose

"[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved. Thus, a contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant. But if it is for criminal contempt the [sanction] is punitive, to vindicate the authority of the court.'" *Id.* at 827–28 (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444 (1911)).

The Bankruptcy Court expressly and repeatedly labeled its sanctions as civil. *See, e.g.*, ECF 164 at 19 (discussing the "power to impose civil contempt sanctions"); *id.* at 20 (describing the "standards for imposing civil contempt"). Moreover, the Bankruptcy Court's stated purpose for imposing sanctions was to coerce Worms into compliance. For example, the concluding sentence of the Sanctions Opinion reads, "Monetary sanctions will continue to accrue until Worms complies with the Subpoena by producing responsive documents in the possession of Markus' agents and attorneys wherever they are located." BK-ECF 164 at 25. These features count in favor of construing the sanctions as civil.

"As *Gompers* recognized, however, the stated purposes of a contempt sanction alone cannot be determinative." *Bagwell*, 512 U.S. at 829. The Court must address the nature of the fine imposed.

### b) Nature of the fine

"[W]hether a sanction should be treated as criminal or civil in nature turns on several factors, including whether the sanction is intended to be compensatory or punitive; whether it is payable to the court or to the injured party; whether it is based on past wrongful conduct or is intended to coerce future compliance; and whether any opportunity to purge the sanction is provided." *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 142 (2d Cir. 2000). A sanction "is considered civil and remedial if it either coerces the defendant into compliance with the court's order, or . . . compensates the complainant for losses sustained. Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." *Bagwell*, 512 U.S. at 829.

The Bankruptcy Court ordered Worms to pay two different fines:

(1) Worms was ordered "to pay to the Clerk of the United States Bankruptcy Court for the Southern District of New York $1,000 per day or a total of $34,000 since his non-compliance on September 4, 2019"; and

(2) Worms was "further ordered to pay $1,000 per day going forward for each day that he fails to comply with [the Bankruptcy] Court's discovery orders."
BK-ECF 157 at 2.

The monetary sanctions of $1,000 per day until Worms complied with the discovery orders "afforded [him] an opportunity to purge." *Bagwell*, 512 U.S. at 829; *see id.* (explaining that "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court

order . . . exert[s] a constant coercive pressure" such that "once the jural command is obeyed, the future, indefinite, daily fines are purged"); *see also CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 102 (2d Cir. 2016) (highlighting the "coercive purpose of prospective fee schedules"). They are plainly civil.

The $34,000 payable to the Clerk of Court for noncompliance since September 4, 2019 is a trickier question for two reasons—first, Worms's inability to avoid or diminish the fine, and second, the fact that the fine was payable to the Clerk of Court rather than to the FR.

"Where a fine is not compensatory," even "a 'flat, unconditional fine' totaling . . . as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Bagwell*, 512 U.S. at 829 (quoting *Penfield Co. of Cal. v. Sec. & Exch. Comm'n*, 330 U.S. 585, 588 (1947)); *see also FilmOn.com, Inc.*, 814 F.3d at 102 ("An opportunity to purge is essential."). Here, the Sanctions Order indicates that the $34,000 is absolutely fixed. The question remains whether the fine is compensatory—as it must be to survive. *Bagwell*, 512 U.S. at 829.

Ordinarily, "[w]here compensation is intended, a fine is imposed, *payable to the complainant*." *United States v. United Mine Workers of America*, 330 U.S. 258, 304 (1947) (emphasis added); *see New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989) ("Compensatory sanctions should reimburse the injured party for its actual damages."); *see also Mackler Prods., Inc.*, 146 F.3d at 129 (listing the fact that the "sanction was payable to the court, rather than to the injured party" as evidence of the sanction's "punitive nature"); *In re McLean Indus., Inc.*, 76 B.R. 291, 297 (Bankr. S.D.N.Y. 1987) ("To make the sanction payable to the United States or the Court Clerk would strongly indicate that the sanction is criminal in nature."). A lump-sum sanction payable to the court may be

compensatory but usually only if it is designed to compensate "the judicial system" or bears a relationship to the cost to the judicial system. Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse*, § 28 (2019); *see id.* (citing *In re Engle Cases*, 283 F. Supp. 3d 1174 (M.D. Fla. 2017)) ($9,164,404.12 payable to the court to reimburse cost of processing 1,250 meritless cases, at $6,983.42 per case as calculated by a Rand study, plus associated costs); *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1111 (9th Cir. 2005) ("The monetary sanctions imposed . . . were compensatory in nature because they were designed [in relevant part] . . . to reimburse the district court for the jury costs incurred as a result of the mistrial.").

The Bankruptcy Court's $34,000 fine did not attempt to make whole the party who unfairly incurred damages as a result of Worms's noncompliance. Nor did the fine compensate the judicial system for costs associated with the noncompliance. Rather, the fee was payable to the Clerk of Court for unspecified reasons. At the hearing on October 3, when the sanctions were first announced, the Bankruptcy Court did not offer a compensation-based explanation for the lump sum. Instead, the Bankruptcy Court declared, "The Court is entering an order imposing sanctions against Mr. Worms in the amount of 1,000 dollars per day for which he has failed to comply with Court orders. So far, that totals 29,000 dollars." BK-ECF 160 at 68. The Bankruptcy Court further implied that the $29,000 was punitive in nature when it explained:

> The sanctions that I am awarding today against Mr. Worms are for flagrant violations of Court orders. And that is an affront to the federal court, and for that reason, those sanctions are payable to the clerk of the United States District Court for the Southern District of New York.

BK-ECF 160 at 70. Such type of sanction is criminal and cannot survive.[16]

### 6. Scope of Remand

Briefing before this Court suggests that noncompliance with the July 30 Order may have ceased. Specifically, in response to Worms's motion to stay the Sanctions Order pending appeal, the FR describes "a change of circumstances" insofar as "counsel for Ilya Bykov ('Bykov'), who holds a power of attorney from Markus and instructs Worms, agreed that Bykov would send notices to Markus' agents to obtain documents regarding Markus' assets responsive to the [ . . . Subpoena." Sanctions ECF 5 at 2. As expressed at oral argument, the Court doubts the basis for continuing to hold Mr. Worms in contempt at any time after the contempt was purged—directly or indirectly. Sanctions ECF 25 at 51.

Accordingly, although the Court affirms the Bankruptcy Court's Sanctions Order to the extent it exercised inherent authority to sanction Worms for noncompliance with discovery orders, the Court remands the Sanctions Order entirely so that the Bankruptcy Court may determine the sum of $1,000 per diem sanctions that should be imposed. Furthermore, as discussed above, the portion of the Sanctions Order imposing lump-sum retroactive sanctions was improperly criminal in nature, and is therefore vacated.

## VI. FEES ORDER

### A. Standard of Review

"A bankruptcy court's decision to award attorney's fees is reviewed for abuse of discretion." *In re Tribeca Mkt., LLC*, 516 B.R. 254, 269 (S.D.N.Y. 2014). Indeed, a "bankruptcy

---

[16] Worms argues, in one paragraph at the end of his brief, that the Bankruptcy Court committed reversible error by not considering Worms's financial circumstances before sanctioning him. He references language from *New York State Nat. Org. for Women v. Terry* directing that a court "should" consider, among other factors, the "contemnor's financial resources." 886 F.2d at 1353. Although the Bankruptcy Court may not have specifically inquired into Worms's financial position, the amount of sanctions and its proportionality to Worms's conduct reflects consideration of the circumstances. Furthermore, the Sanctions Opinion specifically cites "the contemnor's financial resources" as a factor to consider when imposing sanctions, which indicates that the Bankruptcy Court took it into account. BK-ECF 162 at 22. The Court discerns no abuse of discretion on this point.

court's decision with regard to compensation for services performed during bankruptcy proceedings deserves great deference." *Howard v. High River Ltd. P'ship*, 369 B.R. 111, 114 (S.D.N.Y. 2007); *see also In re JLM, Inc.*, 210 B.R. 19, 23 (2d Cir. BAP 1997) ("Bankruptcy courts enjoy wide discretion in determining reasonable fee awards, which discretion will not be disturbed by an appellate court absent a showing that it was abused."). "A bankruptcy court exceeds its allowable discretion where its decision (1) rest[s] on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) cannot be located within the range of permissible decisions, even if it is not necessarily the product of a legal error or a clearly erroneous factual finding." *Schwartz v. Geltzer (In re Smith)*, 507 F.3d 64, 73 (2d Cir. 2007).

"It merits underscoring that 'abuse of discretion'—already one of the most deferential standards of review—takes on special significance when reviewing fee decisions." *In re Holocaust Victim Assets Litig.*, 424 F.3d 150, 157 (2d Cir. 2005) (quoting *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (internal quotation marks omitted)). The fee-awarding court, "intimately familiar with the nuances of the case, is in a far better position to make [such] decisions than is an appellate court, which must work from a cold record." *Id.* (quoting *In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992)) (internal quotation marks omitted).

### B.     Factual Findings Predicate Awarding $60,000 in Attorneys' Fees

Before this Court, Worms argues that the FR's time entries evidenced duplicative and excessive billing practices.[17] The FR's opposition defends the validity of its time entries, and urges that they support a $60,000 award. Courts awarding attorneys' fees have been instructed to

---

[17] Worms's appellant brief for the Fees Order also repeats many of the arguments in his appellant brief for the Sanctions Order. Those arguments have been addressed above.

"calculate a 'presumptively reasonable fee' by determining the appropriate billable hours expended and 'setting a reasonable hourly rate, taking account of all case-specific variables.'" *Lilly v. City of New York*, 934 F.3d 222, 229–30 (2d Cir. 2019) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 189–90 (2d Cir. 2008)). In this case, the Bankruptcy Court required the FR to submit "detailed time records to support [the] request for attorneys' fees." BK-ECF 160 at 70. The FR complied, providing a comprehensive breakdown of the efforts expended on the relevant portions of this matter. The breakdown included: (1) a chart reflecting each attorneys' hourly rate, hours expended, and total billed amounts; (2) a summary of billing codes categorizing the tasks for this matter; and (3) an itemized billing statement based on contemporaneous bills sent to the client. BK-ECF 176. The FR requested $60,000 in fees.

In response to the FR's detailed motion to the Bankruptcy Court, Worms responded with a memorandum of law that primarily rehashed his legal arguments for the Sanctions Order's invalidity. The memorandum also argued, without citation to legal authority, that the Bankruptcy Court's finding of contempt required an evidentiary hearing. *But see Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 335 (2d Cir. 1999) ("We have held that the opportunity to be heard does not necessarily entitle the subject of a motion for sanctions to an evidentiary hearing."). Worms's response did not contest any of the billing practices or time entries described in the FR's motion.

The Bankruptcy Court ultimately decided to award fees against Worms in connection with the preparation of the sanctions motion. And, after concluding that "the time records submitted by the FR were appropriately detailed, the time spent by FR's counsel in preparing and arguing the Sanctions Motion was reasonable and appropriate, and the hourly rates charged for

the work performed was reasonable (and, indeed, low by New York standards)," the Bankruptcy

Court awarded $60,000. BK-ECF 200 at 2.

"Any arguments not raised in the bankruptcy court are considered waived; unless such a

waiver results in manifest injustice, the new arguments will not be considered on appeal." *Sec.*

*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 598 B.R. 102, 111 (S.D.N.Y. 2019).

Worms's challenges to the FR's billing practices and time entries are plainly waived. Even if

they were not, they would fail. Worms protests that the award can only be supported by counting

time billed prior to the September 9, 2019 hearing, but the FR has presented ample evidence

from which the Bankruptcy Court could have concluded that the FR incurred $60,000 in costs in

connection with the sanctions motion. There was no abuse of discretion in the Bankruptcy

Court's calculation of the fee amount.

### C. Whether the Bankruptcy Court Abused Its Discretion by Awarding $60,000 in Attorneys' Fees in Connection with the FR's Sanctions Motion

Despite proper calculation of the fee amount, a "bankruptcy court exceeds its allowable

discretion where its decision . . . rest[s] on an error of law (such as application of the wrong legal

principle) . . . ." *In re Smith*, 507 F.3d at 73. In the FR's motion for fees, the FR emphasized that,

"[i]f a [Rule 37] sanctions motion is subsequently granted – or even if the discovery is merely

provided after the motion is filed but prior to a court order – 'the court *must*, after giving an

opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or

attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in

making the motion, including attorney's fees.'" BK-ECF 176 at 6. The FR's motion stressed,

"Such an award is mandatory." *Id.*; *see id.* at 6–7 ("Rule 37 also mandates an award of attorneys'

fees as a sanction against a party who fails to obey a subsequent discovery order: 'the court *must*

order the disobedient party, the attorney advising that party, or both to pay the reasonable

expenses, including attorneys' fees, caused by the failure . . . .'") (quoting Rule 37(b)(2)(A),

(b)(2)(C). The FR's motion is correct that Rule 37 mandates a fee award in the above-specified

circumstances.

By contrast to Rule 37, there is no mandatory award of attorneys' fees when a court

imposes sanctions pursuant to its inherent authority. *Cf. Chambers v. NASCO, Inc*., 501 U.S. 32,

44–45 (1991) (noting that "[a] primary aspect of [the] discretion [to impose inherent-authority

sanctions] is the ability to fashion an appropriate sanction for conduct which abuses the judicial

process").

The Fees Order does not specify which authority the Bankruptcy Court relied on when it

imposed the attorneys' fees award. *See* BK-ECF at 200 at 2 (Fees Order citing Sanctions

Opinion). It is not clear whether the Bankruptcy Court properly exercised its discretion, pursuant

to its inherent authority, or whether the Bankruptcy Court awarded fees in an effort to comply

with Rule 37. The latter would have been an application of "the wrong legal principle" because,

for the reasons explained above, Worms was not sanctionable under Rule 37. *In re Smith*, 507

F.3d at 73.

To assess whether, and ensure that, the Fees Order was issued pursuant to proper

authority, it must be vacated and remanded for reconsideration in light of this Opinion.

## VII.   CONCLUSION

The Sanctions Order is AFFIRMED IN PART, VACATED IN PART, and REMANDED. The Fees Order is AFFIRMED IN PART and REMANDED for reconsideration in light of this Opinion. The motions to stay those orders pending appeal are both DENIED AS MOOT.

SO ORDERED.

Dated: April 3, 2020
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge